Securities and Exchange
Commission,

        Plaintiff,

v.

        Civil No. 07-2879 (JNE/JJG)
        ORDER

Tom Shanahan and
Clem Hannon,

        Defendants.

---

Dee A. O'Hair, Esq., Jonathan S. Polish, Esq., and Robert M. Moye, Esq., United States Securities and Exchange Commission, appeared for Plaintiff Securities and Exchange Commission.

Elizabeth Wiet Reutter, Esq., and Lawrence J. Field, Esq., Leonard, Street and Deinard, Professional Association, appeared for Defendant Tom Shanahan.

Bradley A. Kletscher, Esq., and Tammy J. Schemmel, Esq., Barna, Guzy & Steffen, Ltd., appeared for Defendant Clem Hannon.

---

       In 2005, Zomax, Inc., a publicly-held corporation whose stock was traded on the NASDAQ, restated its results for 2003 and the first three quarters of 2004.[1]  The restatement corrected accounting misstatements made by Zomax Ireland, a wholly-owned Irish subsidiary of Zomax whose financial results were incorporated into Zomax's 10-Q filings with the Securities and Exchange Commission (SEC).  The SEC asserts claims arising from the restatement against Tom Shanahan and Clem Hannon (collectively, Defendants), both former employees of Zomax Ireland, for violations of the Securities Exchange Act of 1934 (Exchange Act), 15 U.S.C. §§ 78a-78*lll* (2006), and rules thereunder (SEC Rules).  The case is before the Court on Defendants' motions for summary judgment, Defendants' motions to dismiss for spoliation, Defendants'

---

[1]     Zomax was purchased by a private equity firm in 2006 and is no longer publicly traded.

motions to exclude testimony of the SEC's expert witness, the SEC's motion to exclude
testimony of Defendants' expert witnesses, the SEC's motion to strike portions of Shanahan's
reply memorandum in support of his motion to dismiss, and Hannon's motion to withdraw and
refile his reply memorandum in support of his motion to dismiss. For the reasons set forth
below, the Court grants Defendants' motions for summary judgment and denies as moot the
remaining motions.

## I.  BACKGROUND

**A.  Organization of Zomax and Zomax Ireland**

Zomax manufactured CDs and DVDs and provided software and related services to
computer manufacturers. According to Melissa Snelson, an expert retained by Shanahan, Zomax
had net earnings of $24,859,000 in 2000, net earnings of $9,033,000 in 2001, a net loss of
$679,000 in 2002, a net loss of $1,175,000 in 2003, a net loss of $8,411,000 in 2004, and a net
loss of $36,146,000 in 2005. Zomax's subsidiary, Zomax Ireland, had a CD manufacturing site
located in Clondalkin, Ireland, and a call center located in Santry, Ireland. In 2004, Zomax
Ireland's financial condition was deteriorating due to increased manufacturing costs and
decreased customer demand. Although Zomax Ireland had historically enjoyed good results in
the fourth quarter of the calendar year, Zomax Ireland's finances significantly deteriorated in the
fourth quarter of 2004.[2] For example, Shanahan's forecast for week 47 of 2004 forecast an
operating loss of €414,000 for October rather than the budgeted operating income of €143,000.[3]
Zomax Ireland closed its Clondalkin manufacturing site in 2007.

---

[2]      Zomax's fiscal year corresponded to the calendar year.

[3]      Some of the figures submitted by the parties are expressed in dollars while others are
expressed in euros. The Court adopts the currency used by the parties when reciting a figure.

Shanahan began working at Zomax Ireland as the director of marketing services in January 2001.  He became the general manager of Zomax Ireland in May 2003.  As general manager, Shanahan was the highest executive officer of Zomax Ireland and reported to Anthony Angelini, the president and chief executive officer of Zomax.  Hannon was hired as Zomax Ireland's financial controller in November 2003.  When hired, Hannon reported to Rob Rueckl, the chief financial officer of Zomax, and had a "dotted line" reporting relationship to Shanahan.  In early 2004, Hannon began reporting to Ani Tourian after she was promoted to the position of operations finance controller for Zomax.  Hannon's dotted line relationship to Shanahan remained intact.

Paul Kearney, the financial accountant at Zomax Ireland from 2000 to 2004, reported to Hannon in 2004.  He also received direction from Shanahan.  Kearney made journal entries in Zomax Ireland's accounts, reconciled the accounts, and prepared the balance sheet and profit and loss statement.  Tony Dignam, who preceded Hannon as Zomax Ireland's financial controller, testified that Kearney was a "very hard worker" but had "a tendency to make mistakes."  It is undisputed that Kearney made the entries giving rise to the misstatements at issue in this suit.  Kearney, who testified that 2004 was a "difficult" year, fell behind with journal entries and failed to reconcile several accounts that year.  Although it was Hannon's responsibility to review Kearney's reconciliations, Hannon failed to do so, and the lack of reconciliation was not discovered until 2005.  Kearney testified that he fell behind because he was taking an evening class and had increased responsibilities at home after the birth of his first child.  In addition, the departure of several employees of Zomax Ireland's finance department in early 2004 required Kearney to assume additional responsibilities.  Kearney was looking for new employment throughout 2004 and resigned from Zomax Ireland in December 2004.

Shanahan, Hannon, Angelini, Rueckl, and Tourian reviewed Zomax Ireland's financial information on a monthly basis. Kearney prepared operations and finance packages for the participants in advance of the monthly meetings. The operations package was sent to Zomax's executive team and the finance package was sent to Robert Shultz, Zomax's corporate controller. In addition, Shanahan provided weekly revenue and operating income forecasts to Angelini. Zomax Ireland also provided account reconciliations to Zomax's general ledger supervisor, who entered Zomax Ireland's financial data into Zomax's general ledgers. The general ledger supervisor was supposed to check the reconciliations, but did not.

**B.      Zomax Ireland's 2004 Misstatements**

In January 2005, Deloitte & Touche (Deloitte) discovered Zomax Ireland's misstatements while conducting its audit for 2004. Deloitte notified Rueckl, who visited Zomax Ireland with Tourian in early February 2005 to investigate. On March 31, 2005, as a result of the investigation, Zomax restated its results for 2003 and the first three quarters of 2004. The portion of the restatement attributable to the first three quarters of 2004 resulted from twenty-three accounting misstatements at Zomax Ireland, twenty-two of which had the effect of increasing profitability or decreasing losses for Zomax. The 2004 restatement decreased Zomax's earnings per share (EPS) from ($0.03) to ($0.05); $0.04 to $0.02; and ($0.17) to ($0.19) for the first, second, and third quarters of 2004, respectively. Kathleen Butler Hughes, an accountant at the SEC, states in an affidavit that Zomax's share price decreased from $4.28 to $3.90 when Zomax announced the restatement in an 8-K on March 1, 2005, and decreased to $2.89 when the restated results were announced in Zomax's 2004 10-K on March 31, 2004.

Of the twenty-three misstatements in 2004, the SEC asserts three as the basis for its suit: unsupported entries in a sales accrual account, the deferral of revenue from America On-Line

(AOL) from the fourth quarter of 2003 to the first quarter of 2004, and the capitalization of spare

parts (spares) used to repair manufacturing machinery. According to Butler, these three

misstatements understated Zomax's operating losses by 15%, 44%, and 5%, for the first, second,

and third quarters of 2004, respectively. Snelson's calculations indicate that the spares and AOL

adjustments did not affect Zomax's reported EPS. She did not provide an estimate of the impact

of the sales accrual account adjustment on Zomax's EPS, but states this adjustment accounted for

approximately 60% of the total restatement for 2004. Snelson states in her expert report that the

restatement did not change any reported operating income to an operating loss or net earnings to

a net loss.

The largest of the three misstatements at issue resulted from unsupported entries made to

Zomax Ireland's sales accrual account. The sales accrual account was used to accrue accounts

receivable for revenue earned from products sold or services rendered but not yet invoiced.

Accounts receivable from Microsoft constituted a significant portion of the sales accrual account

because Zomax Ireland shipped goods to Microsoft on a daily basis, but issued an aggregate

monthly invoice to Microsoft rather than an invoice for each shipment. This procedure required

Kearney to make a journal entry reversing the individual daily invoices and posting an accrual

for the aggregate monthly invoice. According to Kearney, he found it "challenging" to keep up

with the credits and debits to the sales accrual account in 2004.

The SEC contends that Defendants directed Kearney to falsify entries in the sales accrual

account to improve Zomax Ireland's apparent financial results. According to Rueckl, Zomax

discovered during its February 2005 investigation that entries in Zomax Ireland's sales accrual

account were unsupported and reflected no valid business purpose. Most of the entries had been

booked as reductions to cost of goods sold (COGS), thereby improving Zomax Ireland's

financial results. The misstatements in the sales accrual account required adjustments of $367,424; $573,804; and $392,266 for the first, second, and third quarters of 2004, respectively.

Kearney testified at his deposition that he did not intentionally cause Zomax Ireland to overstate its operating results for 2004. He also testified that, while he would not have made material changes to the sales accrual account without authorization from Defendants, he may have made changes if they were not material. In declarations submitted in support of their motions for summary judgment, Defendants deny knowledge of the misstatements in the sales accrual account, making any untrue statements of material fact or omitting to make any statement of material fact regarding the sales accrual account, and any intent to mislead anyone with respect to the sales accrual account.

In February 2005, Hannon e-mailed Kearney about the misstatements in the sales accrual account:[4]

> I attach a copy of the analysis for the Revenue accrual account for 2004. We have tracked through the net movements sales and it makes sense. However, there are entries going though for [COGS] which I want to understand. Can you have a look and see if you can put me in the right direction.

Kearney responded: "The Revenue will all be backed up. I was hoping to flush some of the excess cost out in q4, but with that being as bad as it was. No revenue was put through with out back up. Thats all I can add Clem." Hannon responded: "[J]ust to clarify did we prepay [COGS] in previous quarters in anticipation of higher revenue in Q4 to offset it against. Is there a chance that we did not invoice these [COGS]." The record contains no response from Kearney.

The second misstatement that forms the basis of the SEC's claims is the deferral of revenue from AOL from the fourth quarter of 2003 to the first quarter of 2004. In August 2003,

---

[4]     Unless otherwise indicated, the Court quotes all e-mails without correcting spelling or grammatical errors.

Zomax reserved CD manufacturing capacity for AOL, and Zomax divided the capacity among its sites, including Zomax Ireland. The fee for the reserved capacity was $480,000, of which Zomax Ireland's share was $96,000. Zomax billed AOL for the reserved capacity in November 2003, but Zomax Ireland did not recognize its share of the AOL fee revenue in 2003. Instead, Zomax Ireland deferred its recognition to the first quarter of 2004 and used it to reduce COGS. When restating Zomax's results in 2005, the Zomax Ireland sales accrual account was adjusted to recognize the $96,000 in the fourth quarter of 2003 rather than the first quarter of 2004.[5]

The SEC claims that Zomax instructed Zomax Ireland to recognize its portion of the AOL fee revenue in the fourth quarter of 2003 but Zomax Ireland deferred the revenue to the first quarter of 2004 to improve its first quarter results. Rueckl stated in an affidavit that "[i]n late 2003, Ani Tourian and I instructed the Zomax Ireland finance department to recognize their portion of the AOL capacity reserve fee revenue in the fourth quarter of 2003." Tourian testified at her deposition that she was certain that Zomax Ireland was told to do so in October or November 2003.[6] She did not personally instruct Zomax Ireland, however, and on December 2, 2003, Rueckl asked Tourian via e-mail to confirm that the revenue could be recognized before allocating the AOL fees to the sites.

On December 10, 2003, Hannon received an e-mail instructing him to invoice Zomax Canada for Zomax Ireland's share of the AOL fee. Rueckl and Tourian were copied on this e-

---

[5]    The $96,000 is included in the $367,424 restatement of the sales accrual account for the first quarter of 2004.

[6]    The SEC asserts: "According to Tourian, defendants deferred the AOL fee to 2004 because Zomax Ireland was already on plan for the last quarter of 2003 and defendants knew that the first quarter of 2004 would not be great." Page 85 of Tourian's deposition transcript, which the SEC cites to support this contention, is not in the record, and the Court cannot determine the basis for Tourian's knowledge of Defendants' motivation. Accordingly, the Court gives this assertion no weight.

mail.  Hannon forwarded the e-mail to Kearney the next day, stating: "It looks like we have possibly got that stock provision that we were looking for.  However I am not sure if Rob [Rueckl] will want us to show it in our revenue numbers for month end.  Can we raise the invoice to Zomax Canada in any event."  Kearney responded by e-mail the next day: "Karan has billed this to Canada, we dont have to be told twice!!  I will take it to my revenue reserve at month end untill you tell me what it will be used for."  Kearney then recorded the $96,000 in the sales accrual account.  Hannon testified at his deposition that because he was new to the job, he left Rueckl a voicemail message in December 2003 asking Rueckl how Zomax Ireland should treat the AOL fee revenue.  According to Hannon, he received no response and forgot about the matter.  With regard to the AOL fee revenue, Defendants deny in declarations making any untrue statements of material fact, omitting to make any statement of material fact, and any intent to mislead anyone.

The third misstatement resulted from Zomax Ireland's capitalization, rather than expensing, of spares when purchased.  Generally Accepted Accounting Principles (GAAP) permit the capitalization or expensing of spares, but all entities within a company must use the same accounting method.  If spares are capitalized, they are carried as an asset on the balance sheet until they are actually used, when they are recorded as an expense and valued at zero on the balance sheet.  If spares are expensed, they are recorded as an expense when purchased and valued at zero on the balance sheet.  Zomax did not have a written policy regarding the accounting treatment of spares.  Tourian testified that Zomax's unwritten policy was to expense spares.  The SEC asserts that Zomax Ireland capitalized rather than expensed spares in the second and third quarters of 2004 to improve its financial results.

Zomax Ireland expensed all spares during the first quarter of 2004. During the second quarter, Zomax Ireland expensed €85,779 worth of spares and capitalized $136,470 (€113,000) worth. In the third quarter, Zomax Ireland expensed €185,954 worth of spares and recorded $66,815 (€54,365) worth in a prepaid expense miscellaneous account.[7] Recording spares in a prepaid account meant the spares were valued as an asset on the balance sheet, thereby deferring losses to a later date. On September 23, 2004, Kearney sent Shanahan and Hannon an e-mail in which he indicated a "spares prepayment release" of €8,000. Shanahan responded: "I think we are looking at 1.51ml at best. Try not to make the hit too hard.!!!" The capitalization of spares was shown in documents provided to Zomax on a monthly basis.

The parties dispute the clarity of Zomax's policy of expensing spares. Paddy Burke, the former general manager of Zomax Ireland, testified that Zomax Ireland capitalized high-value spares having a life span of two to three years, such as lasers, and expensed low-value spares, such as suction cups or bearings. Tourian testified about several discussions involving Zomax and Zomax Ireland regarding the accounting treatment of spares that occurred in 2004. According to Tourian, Zomax became aware that Zomax Ireland was capitalizing spares during a May 2004 teleconference. When describing the May 2004 teleconference, Tourian stated, "I recall saying that Zomax's policy is to expense spares as they were purchased and that Zomax Ireland needed to comply with that policy as well." She later testified: "[D]uring [the May 2004] conference call there was some confusion as to whether they had to expense the spares or not because [Angelini] made a comment about, yeah, I think there was something about capitalizing

---

[7]     Rueckl's declaration states Zomax Ireland's capitalization of spares in the third quarter of 2004 required an adjustment of $79,129. The record does not reflect the source for this figure. Hughes states in her declaration that the third quarter spares adjustment was $66,815, the Complaint alleges a third quarter spares adjustment of $66,815, and an expert witness retained by Shanahan identifies a third quarter spares adjustment of $66,815. Accordingly, the Court uses $66,815.

spares. So there was some confusion, so we didn't condemn them for the confusion." According to Tourian, "it was kind of murky in terms of what direction we were providing" because Angelini indicated during the May 2004 conference call that spares could be capitalized while Tourian indicated that Zomax's policy was to expense spares.

The record is unclear as to when the Zomax executive team discovered that Zomax Ireland was still capitalizing spares and instructed Zomax Ireland to stop. At one point during her deposition, Tourian agreed that she could not give any more specificity than "before year end." At another point during her deposition, however, Tourian testified: "When we discovered that they were still capitalizing the spares, I believe it was in August of 2004, again it was during a conference call." She also testified: "As I said, there might have been confusion in the call in May or June, and that was clarified in the August-September time frame by [Angelini] as well." Tourian later testified that "[w]e gave them the benefit of the doubt that they didn't understand that they were supposed to expense them immediately and told them once again in the August-September time frame that they needed to expense them." Dignam, who participated in the calls as the manager of the Santry call center, testified that "Angelini . . . explained that we should be capitalising [spares]." According to Dignam, Zomax Ireland received a later instruction to expense the spares which "never got through to being implemented."

With respect to the accounting treatment of spares, Defendants deny in declarations making any untrue statements of material fact, omitting to make any statement of material fact, and any intent to mislead anyone. Kearney testified that he was never told to avoid expensing spares to improve Zomax Ireland's financial results. Shanahan states in his declaration that he instructed Hannon to tell Kearney to stop capitalizing spares "in 2004." Hannon testified that he was told at some point in 2004 that Zomax Ireland had to stop capitalizing spares and instructed

Kearney accordingly. Kearney testified that he thought Hannon told him to expense all

capitalized spares in late 2004, but could not remember if he did so before he left Zomax Ireland.

According to Snelson, the Zomax Ireland spares previously capitalized were not expensed.

> On December 24, 2004, Shanahan sent Angelini a memo stating:
>
> I may have mislead you yesterday when I said that we write off all spares and
> don't carry spares [in inventory]. There is approx 100k€of spares covering
> spares for all lines except 14 and 15 in the spares room. These have been built up
> over the years and cover most of the smaller nitty gritty spares needed to keep the
> lines running.

No evidence in the record indicates that Angelini responded to Shanahan's statement that Zomax

Ireland had €100,000 of spares in inventory.

Discussion about the appropriate accounting treatment of spares continued into early

2005. On January 13, 2005, Tourian e-mailed Hannon after reviewing Zomax Ireland's 2004

inventory numbers and asked: "Why do you have spares? I thought you were instructed that this

should be expensed as you receive." Tourian testified that this question was "facetious" and that

she was being "sarcastic" because she was "getting annoyed with the fact that [the topic of

spares] kept coming up." On January 28, 2005, Shultz e-mailed Hannon instructions for the

Deloitte audit and stated: "Apparently there is a misunderstanding regarding our policy for spare

parts. There are spare parts on our balance sheet that have not been expensed. . . . Has

capitalization of spares been done in prior years or is this new to 2004?" Shultz testified during

his deposition that he remembered "conversations around spares prior to getting to the end of

[2004]," but could not remember any specifics.

**C.    Zomax Ireland's Forecasts**

Shanahan provided forecasts of Zomax Ireland's performance to Zomax.  On February 16, 2004, Kearney sent Shanahan a forecast indicating that Zomax Ireland would lose between €20,000 and €25,000 in February.  Shanahan responded:

> [T]his is before release, I presume.  If so, I am going to forecast a breakeven/Tiny profit for Feb.  If this is the case and we dont have to use all of our 45k release in Feb but use the remainder in March what is the Sales figure for March to allow us to breakeven for the Quarter.?

Kearney confirmed that the forecast was before release and stated:

> We will require €1.6m in March to breakeven and the current March forecast stands at €1.2m.

> If we use 20k of our accrual in Feb to breakeven it will leave 60,000 of our accrual remaining: If revenue is well balanced and not all very low margin, then 1.5m along with 60k release will break us even for the qtr.

Shanahan responded by asking if that was "all of our release used," and Kearney replied, "Another 25k due from a vat reclaim . . . but we will not have that until Q2."  Shanahan replied: "Keep it.  We will need it, believe me."  Hannon was copied on the e-mail chain.

Shanahan's weekly site report for Angelini, sent on the same day, predicted an operating income of €10,000 for February instead of the €20,000 to €25,000 loss Kearney originally predicted.  Zomax Ireland ultimately reported an operating income of €2,000 for February.

On June 21, 2004, Shanahan received a draft of the weekly report for Angelini.  The report forecast revenue for June of €1.350 million and an operating loss between €60,000 and €80,000.  In his reply e-mail, Shanahan gave the following instructions to Kearney: "Review the forecast in detail . . . . Look at all accruals and the other items in my previous mail.  Dont be overly conservative.  We cant afford to be this month.  July looks strong.  I have not sent this forecast on for obvious reasons."  The next day, Shanahan instructed Kearney to "minimiz[e] the

June forecast damage." Shanahan specifically told Kearney to "[l]ook at reversing the sales commission accrual, capitalise more spares, spread any costs you can over the year" because he wanted "to come in as close to break even" as possible.

On June 23, 2004, Shanahan forwarded Kearney instructions for formatting the June forecast and noted: "[t]he June forecast document you emailed me still had a loss of 78k. Adjust this before sending to circa 30k." Kearney responded: "The forecast document I sent to you was for internal purposes only . . . . I have revised the forecast as per your recommendation to a loss of 30k." On June 29, 2004, Shanahan sent a weekly report to Angelini forecasting an operating loss of €30,000 for June. Zomax Ireland ultimately reported an operating loss of €23,000 for that month.

### D.    Defendants' Post-Zomax Employment

Zomax terminated Defendants' employment at Zomax Ireland as a result of the accounting misstatements. Defendants, both life-long citizens and residents of Ireland, are chartered accountants, which is the Irish equivalent of a certified public accountant. Hannon is currently working as a financial controller for two individuals whose interests are privately held. Shanahan owns his own business, which is incorporated in Ireland and provides telephone answering and administrative services to small companies in Ireland. The business has no U.S. investors and none of its customers are U.S. publicly-traded companies.

Before this case, the SEC had never charged Defendants with any misconduct. Defendants have never applied for, nor been offered, a position as an officer or a director of a U.S. publicly-traded company. Defendants testified that they have no intention of applying for an officer or a director position with a U.S. publicly-traded company and that they are unlikely to be offered any such position due to the negative publicity in Ireland's national newspapers

resulting from this case.  Shanahan testified that this case has "soured" him on the possibility of working for a U.S. publicly-traded company and that he will not violate the U.S. securities laws in the future.

**E.      SEC Investigation**

On February 25, 2005, Zomax's counsel advised the SEC that Zomax would retain independent auditors to investigate the accounting misstatements at Zomax Ireland.  Zomax subsequently retained KPMG for that purpose.  On May 2, 2005, Zomax provided the SEC with a copy of KPMG's investigation report.  The SEC began its investigation into the Zomax Ireland misstatements shortly thereafter.

During the course of its investigation, the SEC asked Zomax in 2005 to voluntarily produce "[a]ll documents reviewed by KPMG during the course of the audit of Zomax [Ireland] relating to imaged hard drives of Paul Kearney and Clem Hannon" and "relating to emails extracted by Zomax from the Zomax [Ireland] server."  Later in 2005, the SEC requested the voluntary production of all e-mail correspondence after November 1, 2003, sent by Angelini, Rueckl, Tourian, or Shultz to Shanahan, Kearney, or Hannon and vice versa.  The SEC never requested the complete e-mail boxes of Angelini, Rueckl, Tourian, or Shultz or any e-mails sent among them or other members of the Zomax finance team.

After learning in early 2008 that the SEC had not requested e-mails between Angelini, Rueckl, Tourian, and other members of the Zomax finance team, Hannon served a subpoena on Zomax's successor, Zomax Incorporated (Zomax II), for e-mails between those persons.  Shanahan served a subpoena on Zomax II for all 2003-05 e-mails sent by or to Angelini, Rueckl, and Tourian.  Defendants moved to compel after Zomax II refused to produce the e-mails, and the Court ordered Zomax II to restore backup tapes containing the requested e-mails.  Although

Zomax II produced over one hundred backup tapes in October 2008, the tapes contained only some e-mail boxes for Angelini and no e-mail boxes for Rueckl, Tourian, or any other member of the Zomax finance team. The missing e-mail boxes were never located.

The SEC filed this lawsuit against Defendants on June 15, 2007. On July 13, 2007, the SEC entered a Cease-and-Desist Order against Kearney prohibiting him from further violations of the Exchange Act and SEC Rules.

## II. DISCUSSION

### A. Defendants' Motions for Summary Judgment

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The movant "bears the initial responsibility of informing the district court of the basis for its motion," and must identify "those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant satisfies its burden, the nonmovant must respond by submitting evidentiary materials that "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In determining whether summary judgment is appropriate, a court must look at the record and any inferences to be drawn from it in the light most favorable to the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The SEC contends that Defendants violated the Exchange Act and SEC Rules by directing Kearney to falsify entries in the sales accrual account, defer the AOL fee revenue to improve 2004 results, and capitalize spares in the second and third quarters of 2004 to defer

losses.[8]  The SEC maintains that Defendants, anticipating a profitable fourth quarter, intended to reverse the false entries made during the first three quarters, but Zomax Ireland's poor fourth-quarter performance prevented them from doing so.  The SEC asks the Court for an order permanently enjoining Defendants from violating the Exchange Act and SEC Rules and barring Defendants from acting as an officer or a director of a U.S. publicly-traded company.[9]

Defendants make several arguments in support of their motion for summary judgment, including that the SEC cannot show that it is entitled to a permanent injunction or an officer/director bar.  For the reasons set forth below, the Court concludes that even if the SEC succeeded in showing Defendants violated the Exchange Act or SEC Rules, the SEC is not entitled to a permanent injunction or an officer/director bar.  Consequently, the Court grants Defendants' motions for summary judgment.

## 1.    Permanent Injunction

Upon the proper showing, a court may enjoin a person who "is engaged or is about to engage in acts or practices constituting a violation of any provision of [the Exchange Act]" or the SEC Rules from engaging in such acts or practices.  15 U.S.C. § 78u(d)(3).  To obtain such an injunction, the SEC must prove that Defendants violated the law and that there is a reasonable likelihood of a further violation in the future.  *SEC v. Comserv Corp.*, 908 F.2d 1407, 1412 (8th Cir. 1990).  In predicting the likelihood of a further violation, a court should consider the totality

---

[8]      The SEC contends that Defendants violated Sections 10(b) and 13(b)(4) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78m(b)(5), and SEC Rules 10b-5 and 13b2-1, 17 C.F.R. §§ 240.10b-5, .13b2-1.  The SEC also claims Defendants aided and abetted violations of Section 13(a), (b)(2)(A) of the Exchange Act, 15 U.S.C. § 78m(a), 78m(b)(2)(A), and SEC Rules 12b-20 and 13a-13, 17 C.F.R. §§ 240.12b-20, .13a-13.

[9]      Specifically, the SEC seeks an order barring Defendants "from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act . . . or that is required to file reports pursuant to Section 15(d) of the Exchange Act."

of the circumstances, including: (1) the degree of scienter involved; (2) the isolated or recurrent nature of the infraction; (3) the defendant's recognition of the wrongful nature of his conduct; (4) the likelihood, because of defendant's professional occupation, that future violations might occur; and (5) the sincerity of the defendant's assurances against future violations. *SEC v. M & A W., Inc.*, 538 F.3d 1043, 1055 (9th Cir. 2008) (quoting *SEC v. Fehn*, 97 F.3d 1276, 1295 (9th Cir. 1996)). Other relevant factors include the egregiousness of the violation, *see SEC v. Sargent*, 329 F.3d 34, 39 (1st Cir. 2003), and the existence of past violations, *see SEC v. Gruenberg*, 989 F.2d 977, 978 (8th Cir. 1993).

The Court first considers Defendants' scienter, as "the degree of scienter 'bears heavily' on the decision" whether to enter a permanent injunction. *See SEC v. Pros Int'l, Inc.*, 994 F.2d 767, 769 (10th Cir. 1993). A permanent injunction is particularly appropriate in cases involving a high degree of scienter. *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1474 (2d Cir. 1996).

Scienter is defined as the defendant's intention "to deceive, manipulate, or defraud." *In re Ceridian Corp. Sec. Litig.*, 542 F.3d 240, 244 (8th Cir. 2008). "[A] plaintiff may satisfy the scienter element [of a claim for securities fraud] with proof of severe recklessness, that is, 'highly unreasonable omissions or misrepresentations that . . . present a danger of misleading buyers or sellers which is either known to the defendant, or is so obvious that the defendant must have been aware of it.'" *Id.* (quoting *Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 654 (8th Cir. 2001)). Simple or even inexcusable negligence does not constitute severe recklessness. *Fla. State Bd. of Admin.*, 270 F.3d at 654.

With respect to the sales accrual account, Shanahan and Hannon deny any knowledge of the misstatements. As evidence of scienter, the SEC first submits an August 27, 2004, e-mail from Kearney to Defendants containing a spreadsheet detailing the differences between the

current balance of accrued liabilities and costs and what the balances should be, which Kearney characterized as "exposure."  In that e-mail, Kearney stated: "I have reviewed the balance sheet with [Hannon] and we have nothing.  In fact we are under accrued in may areas as there has been a number of difficult months now."  Because the sales accrual account is not one of those identified as having "exposure," this e-mail is not evidence of Defendants' scienter with respect to the sales accrual account, and the SEC does not assert the underaccruals in the listed accounts as a basis of its claims.

The SEC also contends that a February 13, 2005, memorandum from Shanahan to Angelini regarding the year-end adjustments is evidence of scienter.  Shanahan stated: "I have to begin by saying that I am astounded by the sheer scale of the adjustments and had no reason to expect that there would be any significant year-end adjustments and certainly did not anticipate the large and troubling number of items as presented to me last Thursday night by [Rueckl] and [Tourian]."  The SEC maintains that this statement is an admission that Shanahan knew about the existence of the errors but was not keeping track of them.  This is not a reasonable interpretation of Shanahan's statement, which indicates nothing more than surprise and dismay at the adjustments.

The SEC also submits the February 2005 e-mail exchange in which Hannon unsuccessfully sought an explanation from Kearney for the unsupported reductions to COGS as evidence of scienter.  Nothing in this e-mail chain suggests that Defendants knew of or instructed Kearney to prepay COGS in anticipation of higher revenue in the fourth quarter or that, as the SEC claims, such prepayments were "a standard operating procedure."  Rather, Hannon's request for clarification as to the prepayment of COGS suggests that he was unaware that Kearney was making such prepayments.

The SEC offers as evidence of scienter the opinion of its expert Edward Weinstein, who states: "[U]nsupported transactions [such as those made in the sales accrual account], in my experience, are never accidental errors. They are deliberate; designed to distort and mislead." Weinstein's opinion is relevant to whether Kearney's entries were likely to have been accidental, but does not create a fact issue as to *Defendants'* knowledge or intent with respect to the entries. Weinstein also opined that Defendants should have known about the misstatements in the sales accrual account and would have discovered them if they had been diligently doing their jobs. At most, this opinion creates an issue of fact as to whether Defendants' conduct was highly unreasonable; it does not create an issue of fact as to whether Defendants intended to deceive, manipulate, or defraud.

As to Zomax Ireland's deferral of the AOL fee revenue, Hannon testified that Rueckl did not respond to his voicemail asking for direction regarding the recognition of the fee. Rueckl stated in his declaration that he instructed "Zomax Ireland" to recognize the revenue in 2003, but he did not state when this instruction occurred or identify whom he instructed. Tourian's statement that Zomax Ireland was instructed to recognize the AOL fee revenue in October or November is similarly unspecific, as well as contradicted by Rueckl's e-mail asking her to confirm that the revenue could be recognized on December 2. Neither statement rebuts the evidence indicating that Hannon sought but did not receive instructions regarding the AOL fee revenue some time around December 10.

The SEC also submits a statement by Shanahan in support of its contention that he intentionally deferred the AOL revenue to the first quarter of 2004 to improve Zomax Ireland's results. Shanahan, when responding in writing to KPMG's report, stated:

> I was aware of the AOL sales accrual.. This was a timing issue where the revenue should have been taken in December but was not taken until Q1. At the time the

rebate was given to Zomax in Ireland it was during a very busy December where sales were approx. €1.8m in the month. To put this further into context sales for the year in Clondalkin were approximately €18ml. I considered that the amount of the deferral was not material as I assumed that there was a cost of sale attached as well. This subsequently turned out not to be the case. This was not intended to be a deliberate revenue deferral as is outlined by KPMG. The adjustment was made by the finance people and I was aware of it.

To establish scienter, the SEC must show "that defendants knew (i) that the statement was false or misleading, and (ii) that it was made in reference to a matter of material interest to investors." *Geffon v. Micrion Corp.*, 249 F.3d 29, 35 (1st Cir. 2001); *see Ferris, Baker Watts, Inc. v. Ernst & Young, LLP*, 395 F.3d 851, 854 (8th Cir. 2005) (stating recklessness sufficient to satisfy the scienter requirement "requires that defendants make statements that they know, or have access to information suggesting, are materially inaccurate"). Here, Shanahan's statement establishes that he was aware of the deferral, but does not establish that Shanahan knew the deferral was a matter of material interest to investors. On the contrary, it is evidence that Shanahan thought the statement was not material because he mistakenly believed it would be offset by a cost of sale.[10] Consequently, Shanahan's statement does not create an issue of fact as to scienter with respect to the deferral of the AOL fee revenue.[11]

Finally, the SEC submits as evidence of scienter Weinstein's opinion that the deferral of the AOL fee revenue was an extreme departure from the standard of care expected of Defendants. At most, Weinstein's opinion creates an issue of fact as to whether Defendants' conduct was highly unreasonable.

---

[10] Snelson states in her expert report that the AOL fee amounted to less than 0.3% of Zomax Ireland's total 2003 revenue and less than 0.05% of Zomax's total 2003 revenue.

[11] The AOL fee was eventually used to reduce COGS, but, as discussed with respect to the sales accrual account misstatements, no evidence indicates that Defendants knew of the false reductions to COGS in the sales accrual account.

As to the capitalization of spares, the SEC's contention that Defendants intentionally capitalized spares in violation of Zomax's unwritten policy of expensing them is undercut by the undisputed evidence establishing that there was confusion about the appropriate accounting treatment of spares between, at a minimum, May and August/September 2004, which corresponds to the time during which Zomax Ireland capitalized spares.[12]  Moreover, Burke's testimony that Zomax Ireland had historically capitalized certain types of spares is undisputed. Given the ambiguity in Zomax's spares policy, Zomax Ireland's violation of the policy does not give rise to an inference that Defendants knew that Zomax Ireland was violating Zomax's unwritten spares policy and did so to mislead investors.  *See In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 272 (S.D.N.Y. 2008) (declining to infer knowledge of rules violation where rules were ambiguous).  Similarly, the SEC's reliance on Shanahan's June 22, 2004, instruction to Kearney to capitalize more spares is not evidence of scienter because it is undisputed that, as of that date, Angelini had given Zomax Ireland the impression that capitalizing spares was acceptable.

The SEC also contends that Shanahan's statement on March 10, 2005, that "it was his prerogative to capitalize the spares as long as these spares were immaterial to the monthly profit figures and on the strict understanding that they would be written off in a subsequent month" is evidence of scienter.  Rather than indicating that Shanahan knew that capitalizing spares violated Zomax's policy, this statement suggests that Shanahan believed he was permitted to capitalize spares.  Moreover, Shanahan's statement does not indicate that he intended to mislead investors

---

[12]     Although Weinstein asserts that Angelini told Zomax Ireland to expense all spares in March 2004 and that Tourian told Hannon to write off spares previously capitalized in June 2004, Tourian's deposition testimony is clear that, regardless of her instructions during the May 2004 teleconference, Angelini had created the impression during that call that spares could be capitalized and that this impression was not corrected until August/September 2004.

by capitalizing spares.  *See In re K-tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 890 (8th Cir. 2002) ("Allegations of GAAP violations are insufficient, standing alone, to raise an inference of scienter.  Only where these allegations are coupled with evidence of corresponding fraudulent intent might they be sufficient.").

The SEC suggests that Shanahan's September e-mail instructing Kearney to "try not to make the hit too hard" when "releasing" capitalized spares, which Kearney described as a "quip," is evidence of scienter.  This argument is unpersuasive because Kearney was informing Shanahan of the expensing, not capitalization, of spares and because Shanahan did not instruct Kearney to expense fewer spares to soften the "hit."  Moreover, no evidence rebuts the testimony of Kearney, Hannon, and Shanahan indicating that Kearney was instructed to stop capitalizing spares and expense all spares previously capitalized.

Weinstein opined that the capitalization of spares in a prepaid account for the third quarter was without accounting justification and implies that Defendants did so to conceal their capitalization of spares from Zomax.  The existence of GAAP violations is insufficient to raise an inference of scienter, *see id.* at 890, and Weinstein and the SEC offer no explanation why Defendants would conceal the capitalization of spares during a time when Zomax Ireland believed that spares could be capitalized.  Moreover, Zomax Ireland listed the capitalization of spares in a prepaid account in its working papers, which Tourian testified were provided to Zomax's general ledger supervisor.  Finally, Weinstein's opinion that Defendants' acts in permitting the capitalization of spares and failure to remove them from the balance sheet were irresponsible and violated the standard of care, at most, creates a genuine issue of material fact as to whether Defendants' conduct was highly unreasonable.

The SEC makes several additional contentions with respect to scienter. The first is based on Zomax Ireland's failure to accrue for $54,896 of holiday/vacation pay starting in August 2004.[13] Kearney testified that he would not have altered the holiday pay accrual account without direction from Shanahan or Hannon, but did not remember the status of the holiday pay accrual account when he left Zomax Ireland.[14] No evidence indicates that Defendants instructed Kearney to manipulate the holiday pay accrual account. The SEC claims Kearney's August 24, 2004, e-mail identifying "exposure" with respect to the holiday pay accrual is evidence that Defendants intentionally manipulated the holiday pay accrual account, and Weinstein criticizes Defendants for not ordering a correction of this underaccrual. These arguments are unpersuasive because the "exposure" identified by Kearney was as of August 2004 (the middle of the third quarter), but the holiday pay accrual for the first, second, and third quarters was not misstated. There is no evidence that Defendants were aware of any "exposure" with respect to the holiday pay accrual account for the fourth quarter. Consequently, Zomax Ireland's failure to accrue for holiday pay in the fourth quarter of 2004 does not create a fact issue as to Defendants' scienter. Weinstein opined that Defendants should have noticed that the balance of the holiday pay accrual account was not changing, but this opinion creates a fact issue as to the reasonableness of Defendants' conduct, not whether they acted with intent to deceive, manipulate, or defraud.

The SEC also contends that Shanahan's e-mails instructing Kearney to improve the February and June forecasts before sending them to Zomax and the fact that the results actually

---

[13]     This error understated Zomax Ireland's expenses for the fourth quarter of 2004, but was not a part of the restatement because Zomax discovered the error before filing its 2004 10-K.

[14]     The SEC contends that "Kearney testified that defendants told him to stop accruing expenses in the holiday/vacation accrual account in August 2004." The cited portions of Kearney's deposition transcript contain no such testimony. Rather, Kearney, who had no recollection of the status of the holiday pay accrual account, merely "presume[d]" that if the balance had been altered, Defendants would have made the decision to do so.

reported for those months generally corresponded to the adjusted forecasts are evidence of intentional manipulation of financial results. This argument is unpersuasive because there is no evidence linking Shanahan's forecast adjustments to false entries in Zomax Ireland's accounts. Further, Defendants submitted evidence that Zomax Ireland's forecasts were in a state of flux throughout 2004. Kearney testified that Zomax Ireland struggled with forecasting earnings and revenue because the sales forecast changed on "an almost" daily basis. Shanahan testified during his deposition that "[t]he forecast process was one where we'd get the initial figure, we'd look at them, we'd see, you know, would it be possible to generate more sales, can we find some cost savings, and that was a continual process right through the year." In the absence of evidence demonstrating a connection between Shanahan's forecast adjustments and entries in Zomax Ireland's accounts, adjustments made to a fluctuating forecast are not evidence of intentional manipulation of financial results.

Finally, the SEC contends that Defendants intentionally made false statements during teleconferences with Zomax. The SEC provides no specifics as to the alleged false statements, and no evidence supports this contention. The SEC also maintains that Defendants falsely executed site certifications stating that they had reviewed Zomax Ireland's financial statements and that, to the best of their knowledge, the information contained within was complete, valid, and accurate in accordance with Sections 302 and 306 of the Sarbanes-Oxley Act of 2002. The SEC essentially argues that Defendants misled Zomax when executing the site certifications because the financial results turned out to be inaccurate. This argument fails in the absence of particular facts suggesting Defendants knew that the results misrepresented Zomax Ireland's true financial condition when they signed the site certifications. *See In re Ceridian Corp. Sec. Litig.*, 542 F.3d at 248.

In short, when considered singly or in combination, the SEC's evidence with respect to scienter does not establish a genuine issue of material fact as to whether Defendants acted with intent to deceive, manipulate, or defraud.[15]  At most, the evidence creates an issue of fact as to whether Defendants' conduct constituted an extreme departure from the standards of ordinary care.  The evidence, however, does not create an issue of fact as to whether Defendants' conduct presented a danger of misleading buyers or sellers of Zomax shares which was either known to Defendants or so obvious that they must have been aware of it.  *See Fla. State Bd. of Admin.*, 270 F.3d at 654 (defining recklessness sufficient to satisfy the scienter requirement as "highly unreasonable omissions or misrepresentations . . . that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it").

Even if the Court assumed Defendants' conduct was "severely reckless" as defined in the securities fraud context, this lesser degree of scienter in conjunction with the Court's findings as to the other relevant factors would weigh against entry of a permanent injunction.[16]  *See SEC v. Freiberg*, No. 2:05-CV-233, 2007 WL 2692041, at *22-23 (D. Utah Sept. 12, 2007) ("The court simply cannot conclude there exists a 'reasonable and substantial likelihood' [defendant] will again violate securities laws from his one-time violation with a scienter of recklessness."); *cf. SEC v. Brethen*, No. C-3-90-071, 1992 WL 420867, at *24 (S.D. Ohio Oct. 15, 1992)("[W]hile

---

[15]     Weinstein opined that the fact that twenty-two of the twenty-three misstatements had the result of improving earnings constituted evidence of intentional misstatements.  In the absence of evidence of Defendants' intent with respect to the three misstatements at issue, this opinion does not create an issue of fact as to Defendants' scienter.

[16]     The parties dispute whether the Court may enter a permanent injunction or an officer/director bar based on solely severely reckless conduct and whether those remedies are available for "books and records" violations under Section 13(b)(5) of the Exchange Act and Rule 13b2-1 of the SEC Rules.  Because the Court concludes that neither remedy is appropriate here even if they are generally available in such cases, the Court does not reach these issues.

the Defendant did act with a degree of scienter which exceeded recklessness, the Court does not consider the degree of scienter with which the Defendant acted to be sufficient, by itself, to warrant an injunction.").  It is undisputed that Defendants have never before been charged with or committed any violations of the securities laws, and no evidence indicates that Defendants have been charged with a violation of the securities laws in the five years since their departure from Zomax Ireland.  *See Freiberg*, 2007 WL 2692041, at *22 (finding that span of five years since last violation and no credible evidence of other violations weighed against entering an injunction); *Brethen*, 1992 WL 420867, at *24 (finding violations isolated where no evidence that defendant had previously engaged in similar behavior).

Moreover, the Court concludes that Defendants' conduct was not egregious.  First, Defendants received no personal profit in the form of bonuses or sales of Zomax stock during 2004.[17]  *See Sargent*, 329 F.3d at 39 ("As the SEC admits, [defendant's] violation was not an egregious one, particularly where he neither traded on the information himself nor derived any direct personal profit.").  Second, while the SEC claims Defendants caused serious harm to Zomax's shareholders, the evidence does not reflect the extent of the harm attributable to the three misstatements at issue or how much of the harm is attributable to the need for a restatement rather than Zomax's financial performance.  Further, the fact that the restatement of all twenty-three misstatements caused Zomax's quarterly EPS to decrease by no more than $0.02 suggests that the three misstatements at issue did not cause serious harm to Zomax shareholders.  *Cf. Romine v. Acxiom Corp.*, 296 F.3d 701, 707 (8th Cir. 2002) (finding that $400,000 misstatement that resulted in overstatement of EPS by $0.01 was not material).

---

[17]     The SEC contends that Defendants profited by retaining their jobs in 2004.  The Court rejects the suggestion that job retention, standing alone, renders a violation egregious.  *Cf. Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994) (finding allegation of desire for continued employment as motive insufficient to support inference of fraud).

In addition, Defendants have recognized, to some extent, the wrongful nature of their conduct. Shanahan states in his declaration that he "regret[s] the financial misstatements that occurred at Zomax Ireland while [he] was General Manager" and that "[w]ith the benefit of hindsight, [he] would have done some things differently." Hannon testified that he should have reviewed the account reconciliations and that he failed in relying on Kearney to produce accurate monthly reports. Although the SEC contends that Defendants have not "owned up to their misconduct," Defendants may "vigorously contest the government's accusations" and are not required "to act like Uriah Heep in order to avoid injunctions." *SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1229 (D.C. Cir. 1989). The SEC also cites Shanahan's statements that he "had done nothing wrong" and "didn't have an issue with" the accounting treatment of the spares and the deferral of the AOL fee revenue as evidence of lack of contrition. Given the confusion surrounding Zomax's spares policy and the evidence indicating that the AOL deferral had a minimal effect on Zomax's results and that Shanahan believed it was immaterial, the Court does not find these statements to indicate Shanahan's lack of recognition of his failures as general manager.

Finally, Defendants' declarations and deposition testimony indicate that neither Shanahan nor Hannon is currently employed in a position to violate the Exchange Act or SEC Rules, further supporting the conclusion that a permanent injunction is inappropriate.[18] *See Sargent*, 329 F.3d at 39 ("[Defendant's] current position . . . does not put him in a position where future violations are likely."); *Pros Int'l*, 994 F.2d at 769 (affirming district court's denial of permanent

---

[18]    The SEC cites *SEC v. G. L. Equities Corp.*, No. 72 Civ. 3929, 1972 WL 346 (S.D.N.Y. Oct. 2, 1972), and *SEC v. Kamen & Co.*, 241 F. Supp. 430 (S.D.N.Y. 1963), for the proposition that an injunction will not harm Defendants if they do not intend to work for a U.S. publicly-traded company again. *G.L. Equities* and *Kamen* are unpersuasive, however, because they involve preliminary injunctions and a different legal standard.

injunction against defendant accountant where no evidence that defendant's occupation was likely to present opportunities for future violations). Although the SEC contends that Defendants could be in a position to work in a financial position for an Irish subsidiary of a U.S. publicly-traded company because they are both chartered accountants, Defendants have indicated that they have no intention of working for a U.S. publicly-traded company or an Irish subsidiary of one, and the SEC identifies no evidence to the contrary. "[T]he mere fact that [Defendants] will remain [chartered accountants] is insufficient for an injunction." *Pros Int'l*, 994 F.2d at 769 (noting that injunction could "have severe economic and professional consequences for an accountant"). Moreover, in light of the negative publicity about Defendants relating to this case, it is unlikely that a U.S. publicly-traded company or an Irish subsidiary of one would hire Defendants in a financial capacity. For these reasons, the Court concludes that the SEC has not shown a reasonable likelihood that Defendants will violate the securities laws in the future, rendering a permanent injunction inappropriate.

### 2. Officer/Director Bar

The SEC also seeks an order barring Defendants from acting as an officer or a director of a U.S. publicly-traded company. The Exchange Act permits a court to enter an officer/director bar if a person has violated Section 10(b) of the Exchange Act or the SEC Rules and "the person's conduct demonstrates unfitness to serve as an officer or director of any such issuer." 15 U.S.C. § 78u(d)(2). Relevant factors include: (1) the egregiousness of the underlying violation; (2) whether the defendant is a "repeat offender"; (3) the defendant's role or position when engaged in the fraud; (4) the degree of scienter; (5) the defendant's economic stake in the

violation; and (6) the likelihood that the misconduct will recur.[19]  *SEC v. First Pac. Bancorp*, 142

F.3d 1186, 1193 (9th Cir. 1998); *SEC v. Patel*, 61 F.3d 137, 141 (2d Cir. 1995).

The only factor supporting entry of an officer/director bar is that Defendants were

employed as the general manager and financial controller of Zomax Ireland when the 2004

misstatements occurred.  *See First Pac. Bancorp*, 142 F.3d at 1193 (affirming entry of

officer/director bar where fraud committed while serving in a corporate or fiduciary capacity).

The other factors weigh against an officer/director bar.  As previously stated, Defendants are not

repeat offenders, the underlying violation is not egregious, and Defendants' scienter, at most,

was severely reckless.  In addition, Defendants' economic stake in the misstatements was

minimal in that their only financial benefit was job retention.  *Cf. id.* at 1192-93 (affirming entry

of officer/director bar where defendant paid himself hundreds of thousands of dollars in salaries,

commissions, and consulting, management and legal fees and extracted sufficient income to

service his heavy personal debt and cover his living expenses).  Finally, the likelihood that

Defendants will commit misconduct in the future is minimal given the undisputed evidence that

they have never served as an officer or a director of a U.S. publicly-traded company and have no

intention of doing so.[20]  Having considered the relevant factors, the Court concludes that the

standard for an officer/director bar is not met.

---

[19]     Prior to enactment of the Sarbanes-Oxley Act of 2002, the statute required "substantial unfitness" rather than "unfitness."  *See* Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, § 305(a), 116 Stat. 745 (codified at scattered sections of 11, 15, 18, 28, and 29 U.S.C.).  Courts still apply the factors enumerated in *First Pacific Bancorp* and *Patel* after the enactment of the Sarbanes-Oxley Act.  *E.g.*, *SEC v. Global Express Cap. Real Estate Inv. Fund, I, LLC*, 289 F. App'x 183, 189 (9th Cir. 2008).

[20]     The SEC contends that Defendants, because they are chartered accountants, might some day serve as an officer or a director of an Irish subsidiary of a U.S. publicly-traded company. However, the SEC does not explain how the relief requested—an order barring Defendants from acting an officer or a director of any issuer having a class of securities registered pursuant to 15

The SEC seeks only the remedies of a permanent injunction and an officer/director bar. Having found that neither remedy is appropriate, the Court grants Defendants' motions for summary judgment and dismisses the SEC's claims.

**B.      Remaining Motions**

Defendants' motions to dismiss for spoliation are denied as moot in light of the Court's grant of summary judgment.  Although denied as moot, a summary of the basis for these motions is necessary to address the SEC's motion to strike Shanahan's reply brief and Hannon's motion to withdraw and refile his reply brief in support of the motions to dismiss.  Briefly, Defendants contend that the SEC acted with intentional bad faith by not asking Zomax to preserve the e-mail boxes of Angelini, Rueckl, and Tourian and in drafting document requests.  Although vigorously advocated by counsel, Defendants' motions to dismiss for spoliation are without discernable merit.  The SEC's motion to strike arose from Shanahan's allegation in his reply brief that the SEC intentionally delayed filing this case in the hopes that exculpatory evidence would disappear.  While the Court gives no credence to Shanahan's allegation of intentional delay, the Court denies as moot the SEC's motion to strike because deletion or retention of the challenged portions of Shanahan's reply brief would not affect the outcome of this case.  *See In re Roosevelt*, 220 F.3d 1032, 1040 n.15 (9th Cir. 2000).  Similarly, Hannon's motion to withdraw and refile his reply brief in support of his motion to dismiss to delete an allegation that the SEC "destroyed" evidence and replace it with an allegation that the SEC did "not preserve" evidence is denied as moot.

---

U.S.C. § 78*l* or required to file reports with the SEC pursuant to 15 U.S.C. § 78o(d)—would prevent Defendants from serving as an officer or a director of a foreign subsidiary of such an issuer.

The Court turns to Defendants' motions to exclude portions of Weinstein's expert testimony. Defendants seek exclusion of Weinstein's testimony as to what Defendants actually knew about the misstatements on the ground that such testimony tells the factfinder what decision to reach. The SEC conceded in its response brief that "Weinstein cannot and will not render opinions about what [D]efendants actually knew."[21] Accordingly, the Defendants' motions are denied as moot insofar as they seek exclusion of Weinstein's testimony as to what Defendants actually knew. Defendants also seek exclusion of Weinstein's testimony as to what Defendants "should have known" and that Defendants' conduct constituted a reckless and extreme departure from the standard of care. Finally, Defendants seek exclusion of Weinstein's testimony that Defendants' acts were "consistent with intentional conduct," which the SEC relied on when arguing that the misstatements in the sales accrual account and the placement of capitalized spares in a prepaid account were intentional. Having determined that summary judgment for Defendants is warranted even when considering Weinstein's opinion on these topics, the Court denies as moot the remainder of Defendants' motions to exclude Weinstein's testimony.[22]

Finally, the SEC moves to exclude the testimony on remedies of Defendants' experts, both law professors, who opined that the remedies requested by the SEC were inappropriate in this case. The SEC maintains that these opinions invade the province of the Court. Because the Court has determined that the requested remedies are inappropriate without consideration of the

---

[21] Despite making this concession, the SEC appears to contend that Weinstein's opinion as to Defendants' knowledge is admissible if he disclosed his underlying assumptions, reasoning, and analysis or if made during the course of concluding that Defendants' actions departed from the standard of care. Given the SEC's unambiguous concession that Weinstein cannot testify as to Defendants' actual knowledge, this argument makes no sense.

[22] Defendants also seek exclusion of Weinstein's testimony as to materiality. This issue is moot due to the Court's grant of summary judgment to Defendants.

law professors' opinions, the Court denies as moot the SEC's motion to exclude their testimony on remedies.

In light of the relatively small amounts of the three misstatements at issue, and the apparent low risk that Defendants pose to shareholders of U.S. publicly-traded companies, the Court questions whether the SEC could not have expended its resources on more important matters. The Court similarly questions Defendants' dubious allegations of spoliation, which served only to waste the resources of the parties and the Court. Despite all of the sound and fury of counsel, the Court concludes that, in the end, this case signified very little. *See* Macbeth, Act V, Scene V.

## III.  CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1.  Defendants' motions for summary judgment [Docket Nos. 116 & 132] are GRANTED.

2.  All remaining motions [Docket Nos. 95, 101, 108, 113, 126, 174 & 178] are DENIED AS MOOT.

3.  This action is DISMISSED WITH PREJUDICE.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  January 13, 2010

s/  Joan N. Ericksen
JOAN N. ERICKSEN
United States District Judge